IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**RASHAD MATTHEW RIDDICK,**

      Plaintiff,

v.                                     Civil Action No. **3:15CV361**

**CRYSTAL WILLETT,** *et al.*,

      Defendants.

### MEMORANDUM OPINION

Rashad Matthew Riddick, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[1] The matter proceeds on Riddick's Particularized Complaint. (ECF No. 9.) Riddick's Particularized Complaint challenges his placement in administrative segregation at the Meherrin River Regional Jail ("MRRJ") when Riddick was both a pretrial detainee and a convicted inmate. As a pretrial detainee, Riddick's claim is governed by the Due Process Clause of the Fourteenth Amendment.[2] *See Shanklin v. Seals*, No. 3:07CV319, 2010 WL 2942649, at *18 (E.D. Va. July 27, 2010) (citations omitted). As a convicted inmate,

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

Riddick's claim is governed by the Eighth Amendment.[3] *See Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir. 1996) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

The Court construes Riddick's Particularized Complaint to assert the following claims:

Claim One:     By continuously keeping Riddick in administrative segregation at the MRRJ, Defendants[4] violated Riddick's right under the Fourteenth Amendment, as a pretrial detainee, to not be subjected to punishment.

Claim Two:     By continuously keeping Riddick in administrative segregation at MRRJ, Defendants violated Riddick's rights, as a convicted inmate, to (a) due process under the Fourteenth Amendment and (b) to be free from cruel and unusual punishment under the Eighth Amendment.

(Part. Compl. at 2–3.) The matter is now before the Court on Defendants' Motion for Summary Judgment. (ECF No. 15.) Although Defendants provided Riddick with appropriate *Roseboro*[5] notice, Riddick has not responded. The matter is ripe for disposition. For the reasons stated below, Defendants' Motion for Summary Judgment will be GRANTED.

## I.     STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings,

---

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[4] Riddick has named the following individuals as Defendants: Crystal Willett, the Superintendent of MRRJ; Major Wright, the Deputy Superintendent of MRRJ; and L. Grant, a Captain at MRRJ.

[5] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

2

depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1871)). "'[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth*, 19 F.3d at 1537 (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submit: (1) an affidavit from Defendant Wright (Mem. Supp. Mot. Summ. J. Ex. 1 ("Wright Aff."), ECF No. 16–1); (2) an affidavit from James Flynn, an officer at MRRJ (*id.* Ex. 2 ("Flynn Aff."), ECF No. 16–2); and, (3) an affidavit from Roy Green, a licensed professional counselor employed by Armor Correctional Health Services Inc., which provides health services for MRRJ (*id.* Ex. 3 ("Green Aff."), ECF No. 16–3).

3

As Riddick failed to respond, Riddick fails to cite the Court to any evidence that he wishes the Court to consider in opposition to the Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(c)(3) (emphasizing that "[t]he court need consider only the cited materials" in deciding a motion for summary judgment).[6] Riddick's complete failure to present any evidence to counter Defendants' Motion for Summary Judgment permits the Court to rely solely on Defendants' submissions in deciding the Motion for Summary Judgment. *See Forsyth*, 19 F.3d at 1537 (quoting *Skotak*, 953 F.2d at 915 & n.7)).

Accordingly, the following facts are established for the Motion for Summary Judgment. The Court draws all permissible inferences in favor of Riddick.

## II.    UNDISPUTED FACTS

Prior to 2015, "Riddick was found not guilty by reason of insanity for a triple murder and [was] committed to Central State Hospital." (Wright Aff. ¶ 7.) While at Central State, Riddick was charged for maliciously wounding a staff member. (*Id.*) He was booked into MRRJ for that charge on January 8, 2015. (*Id.* ¶¶ 2, 7.) Riddick was uncooperative during the booking process. (Flynn Aff. ¶ 2.) He "urinated on himself and engaged in combative behavior requiring [Officer Flynn] and other officers to place him in a restraint chair." (*Id.*) The docket for the Circuit Court of Dinwiddie County, Virginia, shows that Riddick was convicted of the malicious wounding charge on September 29, 2015.[7]

---

[6] Riddick submitted an unsworn Particularized Complaint. Because Riddick failed to swear to the contents of his Particularized Complaint under penalty of perjury, the Particularized Complaint fails to constitute admissible evidence. *See United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004).

[7] *See* http://www.courts.state.va.us/main.htm (select "Case Status and Information;" selection "Circuit Court" from drop-down menu; select hyperlink for "Case Information;" select "Dinwiddie Circuit Court" from drop-down menu and follow "Begin" button; type "Riddick, Rashad," and then follow "Search by Name" button; then follow hyperlinks for "CR15000186–00"). "The Circuit Court's docket is accessible through the Virginia Judicial System Website.

At MRRJ, inmates are assigned housing based upon their classification. (Wright Aff. ¶ 3.) MRRJ uses a points-based classification system, which "assigns points to an inmate based on severity of current charges, serious offense history, escape history, institutional disciplinary history, prior felony convictions, alcohol/drug abuse and stability factors, *i.e.*, whether an inmate is age 26 or over." (*Id.*) Inmates who are "classified as maximum and considered high risk," as well as inmates who require protective custody, are placed in administrative segregation. (*Id.*) Riddick was assigned to administrative segregation because he was "classified as maximum, and placed on high risk status." (*Id.* ¶ 8.) Riddick's classification was "based on his behavior at booking, his history, and the points assigned to him by the points-based classification system." (*Id.*)

"The classification of inmates placed in administrative segregation is reviewed every seven days for the first two months." (*Id.* ¶ 3.) Afterwards, reviews are conducted every thirty days. (*Id.*) The named Defendants "do not conduct these reviews"; they are conducted by a classification officer. (*Id.*) Riddick's "classification was reviewed every seven days for the first two months and was reviewed every thirty days thereafter, pursuant to Jail policies and procedures." (*Id.* ¶ 9.) Riddick was also "evaluated every week by a licensed professional counselor." (Green Aff. ¶ 2.) Riddick remained in administrative segregation until he was transferred to the Newport News City Jail on December 21, 2015. (Wright Aff. ¶ 2.)

An inmate at MRRJ who is assigned to administrative segregation is housed in a single cell that contains a metal bunk, toilet, sink, and shower. (*Id.* ¶ 4.) The cells in administrative segregation "do not have windows to the outside, but they do have windows in the door." (*Id.*)

---

Federal Courts in the Eastern District of Virginia regularly take judicial notice of the information contained on this website." *McClain v. Clarke*, No. 3:13CV324, 2013 WL 6713177, at *1 n.6 (E.D. Va. Dec. 18, 2013) (citations omitted).

An "outside recreation yard . . . with concrete block walls that open[] to the sky [is] attached to the segregation unit." (*Id.*) However, no recreation equipment is available in the segregation recreation yard. (*Id.*) Inmates assigned to segregation "can make telephone calls upon request." (*Id.*) These inmates also "receive their meals on trays delivered through a slot in the door and they eat their meals in their cells." (*Id.* ¶ 6.)

Conversely, inmates assigned to general population at MRRJ "are either housed in double bunk inmate cells . . . or quad six bunk cells . . . ." (*Id.* ¶ 5.) Both "adjoin a larger common area." (*Id.*) Inmates in general population are permitted to socialize in their cells and the common area "for five hours each day unless they are on lockdown or restriction." (*Id.*) During this time, inmates "can shower, recreate, and use the telephone." (*Id.*) All general population housing units have a recreation yard attached; some general population units have a basketball hoop inside them. (*Id.*) Inmates in general population "may eat their meals at dining tables located in their housing unit common area, unless the unit is on lockdown. In that case, they eat their meals in their cells." (*Id.* ¶ 6.)

All inmates at MRRJ, regardless of classification, "can participate in Jail programs upon request." (*Id.*) All inmates can receive visits from family and friends twice per week; "[t]he only difference between inmates in administrative segregation and general population are the days and times upon which they can receive family and friend visitors." (*Id.*) All inmates may request to go to the law library or "receive requested materials from the library cart." (*Id.*) Furthermore, all inmates "typically receive outside recreation time five times per week (Monday through Friday) for one hour unless they refuse, the jail or housing area is on lock-down, or the weather does not permit it." (*Id.*) Inmates will receive, at a minimum, recreation time once per week for one hour. (*Id.*) If the outdoor recreation yards cannot be used, "the Jail has two indoor

recreation yards with basketball goals for use by all inmates, regardless of housing assignment, but at different days and times." (*Id.*)  Defendants Grant and Wright "have no control over the conditions of confinement at [MRRJ], including whether or what type of recreation equipment will be provided to inmates in the recreation yard." (*Id.* ¶ 10.)

### III.    PRETRIAL DETAINEE

In Claim One, Riddick alleges that while he was a pretrial detainee at MRRJ, his continuous confinement in administrative segregation violated his right to not be subjected to punishment under the Fourteenth Amendment.  Specifically, Riddick contends that he was punished because he was housed in a cell with no windows, he had to eat all meals in his cell, and there was no recreation equipment available in the recreation yard attached to the segregation unit.  (Part. Compl. 2–3.)

Under the Fourteenth Amendment, "the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of 'punishment.'"  *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  To determine whether a condition imposed upon a pretrial detainee constitutes punishment, the Court must decide whether the condition "was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 538–40 (1979)).

### A.    Riddick's Placement in Administrative Segregation Was Not an Express Intent to Punish

The relevant precedent teaches that "punishment, whether for a convicted inmate or a pretrial detainee, is the product of intentional action, or intentional inaction, respecting known and *substantial* risks of harm." *Westmoreland v. Brown*, 883 F. Supp. 67, 72 (E.D. Va. 1995)

7

(citing *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994)).  Moreover, "a particular condition

constitutes punishment only where it *causes* physical or mental injury." *Id.* at 76.  Therefore,

"[t]o successfully assert a claim of punishment without due process under the Fourteenth

Amendment, an inmate must assert not only that the defendant[] w[as] deliberately indifferent to

the substantial risk of harm posed by [the challenged condition], but also that this deliberate

indifference *caused* a physical or emotional injury." *Id.*  "There is, of course, a *de minimis* level

of imposition with which the Constitution is not concerned." *Bell*, 441 U.S. at 539 n.21 (citation

omitted) (internal quotation marks omitted).  "Correctional officials are not required to provide

comfortable jails, even for pretrial detainees." *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 476

(7th Cir. 1998).  The short-term limitation of various freedoms and privileges "are simply part of

the general level of discomfort anyone can expect to experience while in custody." *Id.*

Here, nothing in the record before the Court supports a conclusion that Riddick's

placement in administrative segregation constituted punishment.  Riddick has not presented the

Court with any evidence that he suffered from "physical or mental injury" caused by his

placement in administrative segregation. *Westmoreland*, 883 F. Supp. at 76.  Furthermore,

nothing in the record supports a conclusion that Defendants were aware that Riddick's placement

in administrative segregation posed any substantial risk of harm to Riddick. *Id.*  Accordingly,

Riddick fails to demonstrate that the decision to place him in administrative segregation was

"imposed with an expressed intent to punish." *Martin*, 849 F.2d at 870.

### B.   Riddick's Placement in Administrative Segregation Was Rationally Related to a Legitimate Governmental Objective

"An action may be reasonably related to a legitimate governmental purpose if 'an

alternative purpose to which [the act] may rationally be connected is assignable for it' and the

action does not appear 'excessive in relation to the alternative purpose assigned.'" *Robles v.*

*Prince George's Cty., Md.*, 302 F.3d 262, 269 (4th Cir. 2002) (alteration in original) (quoting *Bell*, 441 U.S. at 538). "Legitimate nonpunitive governmental objectives include 'maintaining security and order' and 'operating the [detention facility] in a manageable fashion.'" *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008) (alteration in original) (quoting *Bell*, 441 U.S. at 540 n.23).

Riddick's own behavior during booking, as well as his documented dangerous history and score through the classification system, resulted in his placement in administrative segregation. The decision to place Riddick in administrative segregation was rationally related to the legitimate objective of maintaining security and order at MRRJ. *See Pierce*, 526 F.3d at 1205 (quoting *Bell*, 441 U.S. at 540 n.23). While such placement resulted in Riddick not being able to access recreation equipment, eat outside of his cell, and look out a window, "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell*, 441 U.S. at 540; *see also Phomphackdi v. Spartanburg Cty.*, No. 9:05–3084–DCN–GCK, 2007 WL 858736, at *5 (D.S.C. Mar. 20, 2007) (concluding that plaintiff's eight-month stay in administrative segregation "was not a violation of his due process rights" because he "was segregated pursuant to a legitimate government interest protecting his and the other inmates' well being"). Therefore, an intent to punish cannot be inferred. *See Martin*, 849 F.2d at 870 (citing *Bell*, 441 U.S. at 538). Because Riddick has not demonstrated that his confinement in administrative segregation while he was a pretrial detainee constituted punishment, Claim One will be DISMISSED.

## IV.   CONVICTED INMATE

### A.   Fourteenth Amendment Due Process

In Claim Two (a), Riddick contends that, as a convicted inmate, his continuous confinement in administrative segregation at MRRJ violated his right to due process under the Fourteenth Amendment.   Specifically, Riddick contends that he did not receive his periodic reviews used to determine whether his placement in administrative segregation was still necessary.  (Part. Compl. 2.)

The Due Process Clause applies when government action deprives an individual of a legitimate liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972).  Thus, the first step in analyzing a procedural due process claim is to identify whether the alleged conduct affects a protected interest. *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997) (citing cases).  A liberty interest may arise from the Constitution itself, or from state laws and policies. *See Wilkinson v. Austin*, 545 U.S. 209, 220–21 (2005).

### 1.   The Constitution Fails to Confer a Liberty Interest in Avoiding Segregation

"The Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" *Sandin v. Conner*, 515 U.S. 472, 480 (1995) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)).  "[C]hanges in a prisoner[']s location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his [or her] original sentence to prison . . . ." *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991).  Thus, the Constitution itself does not give rise to a liberty interest in avoiding segregation. *Id.*

10

## 2. Analysis of State-Created Liberty Interests

Demonstrating the existence of a state-created liberty interest requires a "two-part analysis." *Prieto v. Clarke*, 780 F.3d 245, 249 & n.3 (4th Cir. 2015) (quoting *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000)). First, a plaintiff must make a threshold showing that the deprivation imposed amounts to an "atypical and significant hardship" or that it "inevitably affect[s] the duration of his sentence." *Sandin*, 515 U.S. at 484, 487; *see Puranda v. Johnson*, No. 3:08CV687, 2009 WL 3175629, at \*4 (E.D. Va. Sept. 30, 2009) (citations omitted). If the nature of the restraint the plaintiff challenges meets either prong of this threshold, the plaintiff must next show that Virginia's statutory or regulatory language "grants its inmates . . . a protected liberty interest in remaining free from that restraint." *Puranda*, 2009 WL 3175629, at \*4 (alteration in original) (quoting *Abed v. Armstrong*, 209 F.3d 63, 66 (2d Cir. 2000)).

With respect to the *Sandin* threshold analysis, the Court must first "determine what the normative 'baseline' is: what constitutes the 'ordinary incidents of prison life' for *this particular inmate?*" *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015) (citing *Prieto*, 280 F.3d at 253). Second, "with the baseline established, [the Court] determine[s] whether the prison conditions impose atypical and substantial hardship in relation to that norm." *Id.* (citing *Prieto*, 780 F.3d at 254). The United States Court of Appeals for the Fourth Circuit has observed that, "[a]lthough the general prison population is not the relevant atypicality baseline in all cases, it is the touchstone in cases where the inmate asserting a liberty interest was [initially] sentenced to confinement in the general population and later transferred to security detention." *Id.* at 528–29 (footnote omitted) (citing *Prieto*, 780 F.3d at 252).

*Sandin* itself forecloses the notion that all forms of punitive or administrative segregation presumptively constitute an "atypical and significant hardship . . . in relation to the ordinary

11

incidents of prison life." *Sandin*, 515 U.S. at 484.  In *Sandin*, the Supreme Court rejected

Conner's claim that he enjoyed a liberty interest in avoiding confinement in punitive segregation

for thirty days.  *Id.* at 487.  The dissent observed:

> In the absence of the punishment, Conner, like other inmates in [the] general
> prison population would have left his cell and worked, taken classes, or mingled
> with others for eight *hours* each day.  As a result of disciplinary segregation,
> however, Conner, for 30 days, had to spend his entire time alone in his cell (with
> the exception of 50 *minutes* each day on average for brief exercise and shower
> periods, during which he nonetheless remained isolated from other inmates and
> was constrained by leg irons and waist chains).

*Id.* at 494 (Breyer, J., dissenting) (citations omitted).  However, the majority concluded that the

foregoing conditions "did not present the type of atypical, significant deprivation in which a

State might *conceivably* create a liberty interest." *Sandin*, 515 U.S. at 486 (emphasis added).

Defendants have supplied evidence with respect to what life was like in the general

population at MRRJ.  Inmates in general population are permitted to socialize in their cells and

the common area "for five hours each day unless they are on lockdown or restriction." (Wright

Aff. ¶ 5.)  During those five hours, inmates "can shower, recreate, and use the telephone." (*Id.*)

Inmates in general population "may eat their meals at dining tables located in their housing unit

common area, unless the unit is on lockdown.  In that case, they eat their meals in their cells."

(*Id.* ¶ 6.)  Inmates in general population can request to go to the library, receive requested

materials from the library cart, receive visits from friends and family twice a week, and receive

outside recreation time five times per week for one hour. (*Id.*)  Inmates in general population at

MRRJ "are either housed in double bunk inmate cells . . . or quad six bunk cells . . . ." (*Id.* ¶ 5.)

Conversely, inmates in administrative segregation at MRRJ are housed in single cells that

contain a metal bunk, toilet, sink, and shower. (*Id.* ¶ 4.)  These inmates "receive their meals on

trays delivered through a slot in the door and they eat their meals in their cells." (*Id.* ¶ 6.)

12

Inmates in administrative segregation have access to an outside recreation yard, and also receive outside recreation five times a week for one hour. (*Id.* ¶¶ 4, 6.) Inmates assigned to segregation "can make telephone calls upon request." (*Id.* ¶ 4.) Inmates in administrative segregation are permitted to request to go to the law library, receive requested materials from the library cart, and receive visits from family and friends twice a week. (*Id.* ¶ 6.) Moreover, Riddick's classification "was reviewed every seven days for the first two months and was reviewed every thirty days thereafter, pursuant to [MRRJ] policies and procedures." (*Id.* ¶ 9.)

Here, conditions in administrative segregation at MRRJ were not substantially different from conditions in general population. As an initial matter, Riddick received periodic reviews to determine whether placement in administrative segregation was still warranted. The main differences between Riddick's conditions in administrative segregation and conditions in general population are that Riddick could not socialize with other inmates in their cells or a common area, and he ate his meals alone in his cell. He also had to request to use the telephone. The record simply does not reflect that conditions in administrative segregation were significantly harsher than the conditions described in *Sandin* such that a State might conceivably intend to create a liberty interest in avoiding the conditions. *Cf. Beverati*, 120 F.3d at 504 (finding that more burdensome conditions in segregation were not sufficiently atypical). Moreover, courts in the Fourth Circuit have repeatedly rejected the notion that inmates enjoy a protected liberty interest in avoiding confinement in segregation. *See United States v. Daniels*, 222 F. App'x 341, 342 n.* (4th Cir. 2007) ("Extended stays on administrative segregation . . . do not ordinarily implicate a protected liberty interest." (citing *Beverati*, 120 F.3d at 502)); *Paylor v. Lewis*, No. 5:12–CT–3103–FL, 2016 WL 1092612, at *11–13 (E.D.N.C. Mar. 21, 2016) (finding that conditions during plaintiff's 563-day confinement to administrative segregation "were not so

atypical as to create a liberty interest meriting procedural due process protection"); *but see Incumaa*, 791 F.3d at 530–32 (concluding solitary confinement for twenty years involved onerous, severely restrictive conditions and constituted an atypical and significant hardship). Because Riddick fails to demonstrate that he enjoyed a protected liberty interest in avoiding confinement in administrative segregation, Claim Two (a) will be DISMISSED.

**B.      Eighth Amendment Conditions of Confinement**

In Claim Two (b), Riddick contends that the conditions of confinement in administrative segregation violated his right to be free from cruel and unusual punishment under the Eighth Amendment. Riddick alleges that the conditions of confinement in administrative segregation violated his rights because he was confined in a cell with "no outside windows," (Part. Compl. 2) and, he received all his meals "pushed through a metal tray slot cut into the door." (*Id.* at 2–3.) Riddick also contends that the recreation yard attached to the segregation unit is "merely a separate 8x6 concrete box" that does not contain "[any] recreation equipment." (*Id.* at 3.)

When a convicted inmate challenges his conditions of confinement, he must show "(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) (citations omitted). Under the objective prong, the inmate must demonstrate that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson*, 503 U.S. at 9). Thus, "[i]f a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Id.* at 1381. Nothing in the record establishes that the conditions

14

in administrative segregation deprived Riddick of any basic human need or resulted in a serious

or significant physical or emotional injury. *See id.* at 1380–81; *see also In re Long Term Admin.*

*Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471–72 (4th Cir. 1999).

Accordingly, Claim Two (b) will be DISMISSED.

## V. REQUEST FOR INJUNCTIVE RELIEF

Riddick seeks injunctive relief in the form of "being transferred to a more suitable

facility." (Part. Compl. 3 (emphasis omitted).) "[A]s a general rule, a prisoner's transfer or

release from a particular prison moots his claims for injunctive and declaratory relief with

respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009)

(citing *Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007); *Williams v. Griffin*, 952 F.2d

820, 823 (4th Cir. 1991); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986)). Riddick is

now incarcerated at the Newport News City Jail. Accordingly, Riddick's claim for injunctive

relief will be DISMISSED AS MOOT.

## VI. CONCLUSION

For the forgoing reasons, Defendants' Motion for Summary Judgment (ECF No. 15) will

be GRANTED. Riddick's claims will be DISMISSED. Riddick's claim for injunctive relief will

be DISMISSED AS MOOT. The action will be DISMISSED.

An appropriate Order shall accompany this Memorandum Opinion.

Date: 6-9-16
Richmond, Virginia

/s/
James R. Spencer
Senior U. S. District Judge